**Slip Op. 04-45**

**United States Court of International Trade**

<table>
<tr><td>

FORMER EMPLOYEES OF MURRAY
ENGINEERING, INC.

                          Plaintiff,

        v.

ELAINE L. CHAO, UNITED STATES
SECRETARY OF LABOR,

                          Defendant.

</td><td>

Before: Pogue, Judge

Court No. 03-00219

</td></tr>
</table>

[Remanded to the Secretary of Labor for further investigation.]

Decided: May 4, 2004

<u>Ken Walter</u>, Pro Se, for Plaintiff.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, <u>Stephen C. Tosini</u>, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, <u>Jayant Reddy</u>, Attorney, Of Counsel, Office of the Solicitor, U.S. Department of Labor, for Defendant.

**OPINION**

**Pogue, Judge:** In this action, Ken Walter ("Plaintiff"), as a former employee of Murray Engineering, Inc. ("Murray"), challenges the determination of the Department of Labor ("Labor" or "Defendant") that he is not eligible for trade adjustment assistance ("TAA") under the Trade Act of 1974 ("the Act"). Labor found that Plaintiff was not eligible for TAA based on its

determinations that Murray neither produced an "article,"[1] nor a "component part" for a TAA-certified business within the meaning of the Act.[2] Because Labor's first determination relies on its flawed interpretation of the terms of the Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C. § 1202 (2003), the Court remands this action to Labor for further investigation.[3] The Court

---

[1]Section 222 of the Trade Act of 1974, as amended, is codified at 19 U.S.C.A. § 2272 (West Supp. 2003). It reads, in pertinent part:

(a) In general

A group of workers . . . shall be certified by the Secretary as eligible to apply for adjustment assistance under this part . . . if the Secretary determines that--

(1) a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become totally or partially separated . . .; and . . .

(2)(A)(ii) imports of articles like or directly competitive with articles produced by such firm or subdivision have increased.

19 U.S.C.A § 2272(a) (West Supp. 2003).

[2]Congress re-authorized trade adjustment assistance, as provided by the Act, in 2002. Trade Adjustment Assistance Reform Act of 2002, Pub. L. No. 107-210, §111, 2002 U.S.C.A.A.N. (116 Stat.) 935, 936. Congress also amended the Act to cover "adversely affected secondary workers." Id. at § 113. This new coverage is codified at 19 U.S.C.A. § 2272(b). 19 U.S.C.A. § 2272(b) (West Supp. 2003). This provision grants eligibility for trade adjustment assistance to workers whose firm is a supplier of "component parts" to a producer already certified for adjustment assistance. Id.

[3]The Court notes that there are two administrative records in this case: the record as it was developed up to the point of voluntary remand, and a supplemental administrative record developed after the voluntary remand. For each of these records,

reserves review of the second issue until Labor has made a second

determination on remand.

## BACKGROUND

Plaintiff is a former employee of Murray Engineering, Inc.[4]

Plaintiff worked at Murray producing custom designs[5] for industrial

machinery.    In   response   to   Plaintiff's   petition   for   TAA

---

there is a public and a confidential version.  Citations to the
public version of the administrative record up until the
voluntary remand are referred to by the name of the document,
followed by "P.R. Doc. No." followed by the document number.
Citations to the confidential version of the administrative
record up until the voluntary remand are referred to by the name
of the document, followed by "C.R. Doc. No." followed by the
document number.  Citations to the public and confidential
versions of the supplemental administrative record are in the
same format, except that "Supp." precedes "P.R." or "C.R." in the
citations.  Because the supplemental administrative record
largely duplicates the documents available in the record up until
voluntary remand, the majority of the Court's citations are to
the supplemental record.

[4]Plaintiff appears to have worked for a division of Murray
called "Complete Design Service."  See, e.g., Letter from Ken
Walter to the Hon. Donald C. Pogue, Judge, U.S. Ct. of Int'l
Trade, at 2 (Oct. 17, 2003); Response of James S. Murray, Pres.,
Murray Eng'g Inc. to Letter from Christiane Plante, Trade
Analyst, U.S. Dep't of Labor, Supp. C.R. Doc. No. 1 at 4-5 (Jan.
22, 2003) (Labor's questionnaire filled in, signed, and returned
by James S. Murray on Jan. 22, 2003).

[5]Although Labor refers to the items Murray produces
variously as "designs," "drawings," and "schematics", the Court
throughout its opinion refers to the items created by Murray as
"designs."  Such terminology is not indicative of whether or not
the items are "articles" for purposes of 19 U.S.C.A. § 2272(a)
(West Supp. 2003), but is used only because "designs" is not a
term already used by the statutes at issue in this litigation.

certification,[6] Labor initiated an investigation into Plaintiff's eligibility in January 2003. See Consent Motion for Voluntary Remand, Supp. C.R. Doc. No. 3 at 44 (June 17, 2003). Labor denied Plaintiff's petition in February 2003. See Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 68 Fed. Reg. 8,619, 8,620 (Dep't Labor Feb. 24, 2003). Plaintiff requested an administrative reconsideration, which was subsequently denied. Murray Engineering, Inc., Complete Design Service, Flint, MI, 68 Fed. Reg. 18,264, 18,265 (Dep't Labor Apr. 15, 2003) (notice of negative determination regarding application for reconsideration). Plaintiff then appealed his case to the Court. Petition for Judicial Review, Supp. C.R. Doc. No. 3 at 40 (Apr. 30, 2003). The case, however, was voluntarily remanded to Labor. See Former Employees of Murray Eng'g v. United States, slip op. 03-71, at 1 (CIT June 27, 2003).

---

[6]The petition as it appears in the administrative record is undated. See Petition for NAFTA Transitional Adjustment Assistance, Supp. C.R. Doc. No. 3 at 33. Although Plaintiff filed for NAFTA transitional adjustment assistance, which is authorized by the North American Free Trade Implementation Act of 1993, Labor treated the petition as one for trade adjustment assistance under the Act. See 19 U.S.C. §§ 3352-3356 (2000); Information in Support of Former Employees of Murray Engineering Inc.'s Claim for Trade Adjustment Assistance, Supp. C.R. Doc. No. 3 at 17 n.8 (Aug. 1, 2003); see e.g., Response of James S. Murray, Pres., Murray Eng'g Inc. to Letter from Christiane Plante, Trade Analyst, U.S. Dep't of Labor, Supp. C.R. Doc. No. 1 at 4 (Jan. 22, 2003) (Labor's questionnaire filled in, signed, and returned by James S. Murray on Jan. 22, 2003).

Neither in its original determination, nor on remand did Labor make any factual findings regarding the nature of the items produced by Plaintiff's employer or regarding Plaintiff's eligibility for TAA. Rather, Labor made a legal determination that the terms of the HTSUS precluded Murray's designs from being considered to be "articles" under the Act, and that Murray's employees similarly failed to qualify as adversely affected secondary workers because Murray did not supply a "component part" to a TAA-certified business. See Murray Engineering, Inc., Complete Design Service, Flint, MI, 68 Fed. Reg. 53,395, 53,396-97 (Dep't Labor Sept. 10, 2003) (notice of negative determination on remand) ("Remand Determ.").

After remand, the case now returns before the Court on Plaintiff's challenge to Labor's determinations regarding assistance both as a former employee of a company that manufactures an "article" and as an adversely affected secondary worker. Id.; see also Letter from Ken Walter to the Ct. of Int'l Trade (Sept. 30, 2003); Letter from Ken Walter to the Hon. Donald C. Pogue, Judge, U.S. Ct. of Int'l Trade at 9 (Oct. 17, 2003).

**STANDARD OF REVIEW**

The Act contains a provision for judicial review of Labor's eligibility determinations. See 19 U.S.C. § 2395(a) (West Supp.

2003).[7]  Subsection (b) of this provision requires that, in reviewing a denial of certification of eligibility, "[t]he findings of fact by the Secretary of Labor . . ., if supported by substantial evidence, shall be conclusive."  19 U.S.C. § 2395(b) (West Supp. 2003).  The statute, however, does not mention how this Court is to treat Labor's legal determinations.  That Congress would provide for a deferential level of review for Labor's factual findings, but not mention questions of law, could suggest that Congress meant for this Court to conduct a <u>de novo</u> review of Labor's legal determinations under the Act.  See <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229 (2001) (arguing that one can infer from "statutory circumstances" whether deference is due to an agency's legal interpretations).

In the case at issue here, however, Labor seeks to interpret the terms of the Act through its interpretation of the terms of another federal statute, the HTSUS.  Regardless of whether Congress

---

[7]19 U.S.C. § 2395(a) reads, in part:

<u>(a) Petition for review; time and place of filing</u>

A worker, group or workers, . . . or group aggrieved by a final determination of the Secretary of Labor under section 2273 of this title . . . may, within sixty days after notice of such determination, commence a civil action in the United States Court of International Trade for review of such determination.

19 U.S.C. § 2395(a) (West Supp. 2003).

intended to give Labor the scope to interpret the Act, see id.,[8] the HTSUS contains no indication that Congress intended for Labor to have authority to interpret its terms. Rather, the agency charged by Congress with applying and interpreting the HTSUS is the United States Bureau of Customs and Border Protection.[9]  See 19 U.S.C. § 1500.  Nor is there any reason to believe that Labor possesses any particular expertise in regard to the HTSUS.  Cf. NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-57 (1995).  Therefore, there appears to be no Congressional intent for this Court to grant deference to Labor's interpretation of the HTSUS under the doctrine articulated in

---

[8]The Court notes that the presence of formal rulemaking or adjudicative procedures in making an interpretation may be indicative of agency authority to interpret ambiguous statutes. See Mead Corp., 533 U.S. at 229-30.  In this case, to the extent that Labor has issued regulations on eligibility determinations, these regulations, in the main, simply restate the statutory requirements.  Cf. 29 C.F.R. § 90.16 (2003), with 19 U.S.C.A. §§ 2272-2273 (West Supp. 2003). Moreover, there is no regulation on the definition of "articles," although Labor has defined other terms by regulation.  See 29 C.F.R. § 90.2.  Neither does a formal adjudicative process appear to have been followed in this case.  Although Labor claims that "traditionally," it regards the production of designs on a computer as a service, rather than the production of an "article" within the meaning of 19 U.S.C.A. § 2272 (West Supp. 2003), it points to no particular previous adjudication for which this holds true.  See Remand Determ., 68 Fed. Reg. at 53,396.

[9]Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection.  See Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 4 (2003).

Chevron U.S.A. Inc v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984) ("Chevron").[10]

Moreover, even had Congress delegated to Labor the authority to enforce or administer the HTSUS, Chevron still requires that the agency's interpretation be "reasonable." Chevron, 467 U.S. at 844. Labor's interpretation of the HTSUS, however, for reasons discussed below, is faulty, because of its misapprehension as to the scope and coverage of the schedule. See infra pp. 9-12. In addition, the flaws in Labor's interpretation of the HTSUS deprive that interpretation of the "power to persuade." See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

The terms of the Act's provision regarding judicial review, the failure of Congress to assign Labor a role in the administration of the HTSUS, and the failure of Labor to put forth a reasonable or persuasive interpretation of the HTSUS all lead the Court to conclude that deference is not warranted in this case.

_____

[10]The "Chevron doctrine" holds that where an agency interprets ambiguous statutory language, a court should defer to the agency's interpretation, even if it is not the one the court would have reached, as long as it is "reasonable." See Chevron, 467 U.S. at 842-44.

However, there must be indicia that Congress intended for the agency's interpretations to be granted deference. The Court notes that Customs' own interpretations of the HTSUS are not granted Chevron deference, at least when embodied in the form of letter rulings. Mead Corp., 533 U.S. at 221 (2001). Labor's determination here appears analogous to a letter ruling, as it was not made subject to formal procedures, and there is no indication that it is meant to bind parties or persons other than those under review. See id. at 231-32; see also supra note 8.

Therefore, on the record here, Labor's statutory interpretation is subject to <u>de novo</u> review.


## DISCUSSION

Having identified the standard of review appropriate to this case, the Court now turns to the legal issues. Labor has made two legal findings in its negative determination on remand: that Plaintiff is not eligible for TAA because Plaintiff's company does not produce "articles" within the meaning of 19 U.S.C.A. § 2272(a) (West Supp. 2003) and that Plaintiff is not eligible for assistance as an "adversely affected secondary worker" because Plaintiff's company does not produce a "component part" for a certified company within the meaning of 19 U.S.C.A. § 2272(b) (West Supp. 2003). <u>See Remand Determ.</u>, 68 Fed. Reg. at 53,397; <u>see also</u> 19 U.S.C.A. § 2272(a-b) (West Supp. 2003). The Court's opinion will focus on the first finding.

Defendant bases its negative determination of eligibility for assistance under 19 U.S.C.A. § 2272(a) (West Supp. 2003) on two sources -- the HTSUS and the North American Industry Classification System ("NAICS") -- both of which it cites as support for the legal finding that Plaintiff's company does not produce "articles" within the meaning of 19 U.S.C.A. § 2272(a) (West Supp. 2003). <u>See Remand Determ.</u>, 68 Fed. Reg. at 53,396-97. The Court discusses each in turn.

Labor argues that the HTSUS furnishes a guide for determining whether Murray's designs are "articles." See Remand Determ., 68 Fed. Reg. at 53,396; see also Def.'s Mem. Opp'n to Pl.'s Comments Regarding Def.'s Remand Determ. at 10-11 ("Def.'s Mem."). Labor appears to argue that recourse must be had to the HTSUS to determine whether a given object is an "article" because "[t]hroughout the Trade Act, an article is often referenced as something that can be subject to a duty." Remand Determ., 68 Fed. Reg. at 53,396. Indeed, the Act does so reference articles. See, e.g., 19 U.S.C. §§ 2119, 2252(d)(4)(B)-(C)(2000) (discussing "rate of duty on any article", "amount of duty with respect to any article," suspension of liquidation "with respect to an imported article," and imposition of duty "with respect to an imported article").

Labor therefore looked to the HTSUS in deciding whether or not the designs created by Murray were "articles," or objects that could be subject to a duty. See Remand Determ., 68 Fed. Reg. at 53,396; Def.'s Mem. at 10-11. Specifically, Labor looked to the terms of heading 4906, HTSUS, which provide, in part, for "[p]lans and drawings for architectural, engineering, industrial, commercial, topographical or similar purposes, being originals drawn by hand." See Remand Determ., 68 Fed. Reg. at 53,396; Def.'s Mem. at 11.; see also heading 4906, HTSUS. Labor appears to have taken this provision, which singles out hand-drawn originals, to

imply that Congress intended to deny to plans and drawings made with the aid of computers the status of "articles." Remand Determ., 68 Fed. Reg. at 53,396-97, Def.'s Mem. at 11. The provisions of the HTSUS, however, do not support the implication that Labor drew.

Heading 4906 is located within chapter 49 of the HTSUS. Chapter 49 deals generally with printed matter. Chapter 49, HTSUS. While it contains numerous headings for specific types of printed matter, it also contains a basket provision, heading 4911, HTSUS, for "[o]ther printed matter." Heading 4911, HTSUS. The basket provision does not discriminate between printed matter that is generated with the aid of a computer and other types of printed matter. Id. Because engineering plans and drawings have already been placed into the scope of chapter 49 by their inclusion in heading 4906, HTSUS, the logical implication is that heading 4911, HTSUS, for "[o]ther printed matter," encompasses Murray's computer-generated designs, at least to the extent that these are printed. In fact, this conclusion is explicitly indicated by the Explanatory Notes to the HTSUS.[11]

Explanatory Note 49.06 states, in part: "[t]his heading does not cover . . . printed plans and drawings (heading 49.05 or

---

[11]While not legally binding, the Explanatory Notes furnish a helpful guide to the interpretation of the HTSUS. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n.1 (Fed. Cir. 1999) (citation omitted).

49.11).″  Harmonized Commodity Description and Coding System,

Explanatory Note 49.06 (3d ed. 2002) at 905 (emphasis in

original).[12]  The reference to heading 4911 in this Explanatory Note

indicates that because printed plans and drawings are not covered

specifically within a tariff provision of chapter 49, they should

fall into heading 4911, HTSUS; chapter 49's "basket provision."

See chapter 49, HTSUS, heading 4911, HTSUS.[13]  Thus, it appears that

Murray's designs, when printed, are covered "articles."  However,

in addition to heading 4906, for plans and drawings, there exists

in one of the general notes to the HTSUS language which might

appear to exempt drawings and plans from the HTSUS's definition of

---

[12]Heading 4905 covers "[m]aps and hydrographic or similar
charts of all kinds, including atlases, wall maps, topographical
plans and globes, printed."  Heading 4905, HTSUS.  Because the
designs provided by Murray would not appear to be "maps" or
"topographical plans," they would therefore fall into heading
4911, which as noted above, covers "[o]ther printed matter."
Heading 4911, HTSUS.

[13]The Court notes that subheading 9813.00.30, HTSUS,
covering "[a]rticles intended solely for testing, experimental or
review purposes, including specifications" may cover engineering
designs.  Subheading 9813.00.30, HTSUS.  The Oxford English
Dictionary defines "specification" as "[a] detailed description
of the particulars of some projected work in building,
engineering, or the like, giving the dimensions, materials,
quantities, etc., of the work, together with directions to be
followed by the builder or constructor; the document containing
this."  XVI Oxford English Dictionary 159 (2d ed. 1989).  Though
such a definition might include Murray's designs, the designs are
not for "experimental or review purposes," and so the Court does
not discuss the provision in detail.  However, because the
provision does not restrict the form that the specifications
take, it lends credence to the notion that Congress did not mean
to exclude non-hand-drawn designs from the definition of
"articles."

"goods" and therefore, from the Act's definition of "articles."

General note 19 of the HTSUS provides a list of items which are exempted from the HTSUS. General note 19, HTSUS. General note 19 states, in part: "[f]or the purposes of general note 1– . . . records, diagrams and other data with regard to any business, engineering or exploration operation whether on paper, cards, photographs, blueprints, tapes or other media . . . are not goods subject to the provisions of the tariff schedule." General note 19, HTSUS. Such goods, therefore, cannot be the subject of a duty, and would fall outside of the meaning of "articles" under the Act. Thus, because "records, diagrams and other data" may appear to include "plans and drawings," the language of general note 19(c) might seem to be in tension with the language of headings 4906 and 4911, HTSUS, which provide for the classification of "[p]lans and drawings for architectural, engineering, industrial, commercial, topographical or similar purposes," whether hand-drawn or printed. Heading 4906, HTSUS; see also heading 4911, HTSUS. Unfortunately, a survey of lexicographical resources does not dispel this tension.[14]

_____

[14]When interpreting the HTSUS, the United States Court of International Trade has recourse to the current common and commercial meanings of the words therein. See GKD-USA, Inc. v. United States, 20 CIT 749, 754-55, 931 F. Supp. 875, 879-80 (1996) (citation omitted). In identifying the common and commercial meanings of words, the Court looks to dictionaries, encyclopedias, and other lexicographical sources. See id. Because this case, to the extent it requires the Court to distinguish "diagrams" from "plans and drawings," refers to them

The McGraw-Hill Dictionary of Scientific and Technical Terms, defines all three terms – "diagram," "drawings," and "plans." However, it defines them in a way that makes for very little reasonable difference between them.  The definition of "drawing" is "[a] surface portrayal of a form or figure in line."  McGraw-Hill Dictionary of Scientific and Technical Terms 650 (6th ed. 2003). A "diagram" is defined as "[a] line drawing that represents an object or area according to a scale."  Id. at 588.  There appears from these definitions no particular difference between a drawing and a diagram.  Similarly, a "plan" is defined as "[a]n orthographic drawing on a horizontal plane, as of an instrument, a horizontal section, or a layout."  Id. at 1607.[15]  There would

_____

as they exist in the specific world of engineering, the Court has looked to technical and scientific dictionaries and encyclopedias for guidance.

   [15]In addition to the McGraw-Hill Dictionary of Scientific and Technical Terms, the Court has consulted the following sources for a definition of "drawing," "diagram," "plan," or "engineering drawing," and their plurals: IV McGraw-Hill Encyclopedia of Science and Technology 552 (9th ed. 2002); the ASTM Dictionary of Engineering Science & Technology 180 (9th ed. 2000), the McGraw-Hill Encyclopedia of Engineering 421 (2d ed. 1993), Van Nostrand's Scientific Encyclopedia (7th ed. 1989), the Dictionary of Manufacturing Terms (1st ed. 1987), Marks' Standard Handbook for Mechanical Engineers (8th ed. 1978), Gerrish's Technical Dictionary: Technical Terms Simplified (2d ed. 1976), the Engineering Encyclopedia 349-50 (3d ed. 1963), The Harper Encyclopedia of Science (1st ed. 1963), Kent's Mechanical Engineer's Handbook: Design and Production Volume (12th ed. 1956), and Kidder-Parker Architects' and Builders' Handbook (18th ed. 1956).  None of these sources elucidates a difference between the terms. They either fail to define the terms, define them in terms of one another, or contain particular and idiosyncratic definitions which do not appear to have any bearing on this case.

appear, then, to be some question as to whether a principled difference exists between "diagrams," "drawings," and "plans." A survey of other technical reference books by the Court has not clarified this problem; most sources define none of the terms, and those that define even one often contain definitions unsupported by the other reference books.[16]

The Court therefore must examine the legislative history of the relevant statutory provisions. The legislative history of general note 19(c), HTSUS, in particular, indicates that there is a distinction to be made between those "diagrams" that fall under general note 19(c) and those "plans and drawings" which fall under

---

See infra note 16.

[16]For instance, a "drawing," as defined by the ASTM Dictionary of Engineering Science and Technology, is "an architectural, structural, mechanical, or electrical plan, elevation, or section indicating in isometric perspective or in axonometric perspective the detailed location, dimension, quantity, or extent of material, product, or member to be furnished." ASTM Dictionary of Engineering Science and Technology 180 (9th ed. 2000). This definition insists on a high level of detail inherent in a "drawing," a feature which none of the other sources reflect. However, the ASTM Dictionary of Engineering Science and Technology defines neither "diagram" nor "plan." Similarly, the Engineering Encyclopedia provides a definition of "diagram" which is supported by none of the other reference works which the Court has consulted, stating that "[d]iagrams are used for obtaining unknown factors in a problem without carrying out the calculations required in figures" and that "[o]ften diagrams are useful for visualizing a trend or tendency, because a curve will show this much more clearly than a set of figures." Engineering Encyclopedia 349-50 (3d ed. 1963). However, the Engineering Encyclopedia defines neither "drawing" nor "plan."

headings 4906 and 4911, HTSUS.

The earliest version of the general note 19(c) exemption for "diagrams" was added to the Tariff Act of 1930, as amended, by Congress in 1962, as Para. 1827, a duty-free tariff provision encompassing "records, diagrams, and other data with regard to any business, engineering, or exploration operation conducted outside the United States, whether on paper, cards, photographs, blueprints, tapes or other media." Act of May 21, 1962, Pub. L. No. 87-455, 76 Stat. 72 (1962).[17]

The next act passed by Congress was the adoption of the Tariff Schedules of the United States, ("TSUS"), the predecessor to the HTSUS. (Tariff Classification Act of 1962, Pub. L. No. 87-456, 76 Stat. 72 (1962). With the adoption of the TSUS, "Para. 1827" of the Tariff Act of 1930, as amended, became subheading 870.10, TSUS. See subheading 870.10, TSUS (1963). The newly adopted TSUS included, in addition to subheading 870.10 covering "records" and "diagrams," a provision for engineering "drawings and plans" under headings 273.45-.55, TSUS. See subheadings 273.45-.55, TSUS (1963).

When the language of heading 870.10, TSUS, was originally proposed as a tariff provision in 1962, it was described as

_____

[17]The phrase "conducted outside the United States" was apparently meant to narrow the language so that the duty-free provision would not apply to business records merely processed abroad and then re-imported into the United States. See infra note 18. The language was removed in 1982. See infra note 20.

providing for the duty-free importation of documents from the foreign offices of U.S. companies. 108 Cong. Rec. 8,009 (1962) (statement of Rep. Mills). In explaining the provision, Rep. Mills assured his fellow congressmen that the documents that would be covered by the provision were not those which are for sale, but which are the internal documents of the importing business.[18] Id.

---

[18]Representative Mills stated:

The gentleman from Iowa [Mr. Gross] understands that this type of information is not for sale.
    This is something that an American business in its operation abroad has developed for its own use, that it desires to bring back to the main office in the United States. On the basis of existing provisions of the Tariff Act that material would be subject to payment of duty. This would provide that it may enter duty free. . . . The provision would not, of course, apply to business records processed abroad when no other phase of the business operations to which the records pertain occurs abroad.

108 Cong. Rec. 8,009-10 (1962) (statement of Rep. Mills) (alteration in original).
    An explanatory excerpt from the report on the bill prepared by the Senate Finance Committee accompanied the bill when it was passed by the Senate, and included language that supports Representative Mills' statements. 108 Cong. Rec. 6,329-6,330 (1962); see also 1962 U.S.C.C.A.N. 1639, 1639-40 (reprinting S. Rep. No. 87-1318 (1962)). The excerpt stated:

The amendment [providing for duty-free entry of business documents] would clarify a situation now causing extra work for the Bureau of the Customs and putting a burden on business firms with oversea branches. Data with regard to business, engineering, or exploration operations collected abroad and brought back to the United States for consideration by the executives of the firm may be subject to various rates of duty depending more on the type of material upon which the data are recorded than on the content or meaning. These records are not salable, their customs valuation is frequently in

This legislative history indicates that designs sold by one company to another company, when imported, would not be covered by the language of subheading 870.10, TSUS, but rather that the language of general note 19(c) is restricted to internal business documents.

In 1982 it was proposed that heading 870.10, TSUS, be struck, and that rather than providing for duty-free entry of internal business documents, such documents should be exempted from the schedule entirely. <u>See</u> H.R. Rep. No. 97-837, at 37 (1982). The reason for this change is not particularly clear, but its sponsor appears to have proposed the change as part of a series of changes meant to clarify entry procedures generally.[19]   128 Cong. Rec.

---

doubt, and delays and uncertainties are troublesome for business firms as well as for the Federal Government.

108 Cong. Rec. 6,330 (1962) (quoting S. Rep. No. 87-1318 (1962), <u>reprinted in</u> 1962 U.S.C.C.A.N. 1639-40).

[19]By federal regulation, items considered "intangibles" under the general notes to the TSUS could be brought into the country without the making of entry. <u>See</u> 19 C.F.R. § 141.4 (1981)-(1983). The substance of this regulation remains in the Code of Federal Regulations to this day, and was in force at the time Plaintiff brought his petition before Labor, although it had been amended to reflect the change from the TSUS to the HTSUS, and the subsequent changed numbering of the general notes. <u>See</u> 19 C.F.R. § 141.4 (2003). Thus, by striking heading 870.10, TSUS, and reinstating it as an exemption, Congress ensured entry procedures would not have to be followed with regards to internal business documents brought into the United States. Statements made by the sponsor of the proposed changes, when read in conjunction with the language of H.R. Rep. No. 97-837, indicate that the changes proposed were prompted by the rise of international courier services. Making entry on internal business documents brought into the country by such couriers was burdensome; moreover, changes needed to be made to the HTSUS to regulate the making of entry with regard to other sorts of

24,249 (1982) (statement of Rep. Frenzel).  Nothing in the

legislative history of this change contradicts the statements made

in 1962 that the language of subheading 870.10, TSUS, was meant to

apply only to internal documents.[20]  Accordingly, because the

legislative history of general note 19(c) specifies that it applies

only to business documents created for internal use, the Court

cannot conclude that general note 19(c) precludes a plain language

---

articles brought into the country by couriers who were not the
ultimate owners or purchasers of the good.  See 128 Cong. Rec.
24,249 (1982) (statement of Rep. Frenzel); H.R. Rep. No. 97-837,
at 36-37 (1982).

   [20]Representative Frenzel first proposed a bill to exempt
business documents in House bill number 5170.  See 127 Cong. Rec.
30,766 (1981) (noting introduction of bill and referral to House
Ways & Means Committee).  This small bill, along with other small
proposed changes to the TSUS, was collected into a larger bill
comprised of additional changes to the TSUS, House bill number
6867.  See H.R. Rep. No. 97-837, at 36-37 (1982).  House bill
number 6867 was referred to multiple committees in the House; the
Committee on Ways and Means removed the phrase "conducted outside
the United States," from the language.  See H.R. 6867, 97th Cong.
at 19 (Union Calendar No. 519, as reported on Sept. 17, 1982).
The report on House bill 6867 filed concurrently by the House
Ways and Means Committee does not explain the change, although in
combination with the statements made by Representative Mills at
the time that the language was originally passed, it would appear
that the Committee was concerned to include internal business
documents exported to branch offices  and subsequently re-
imported in the exemption.  See H.R. Rep. No. 97-837, at 36-37
(1982); 108 Cong. Rec. 8,009-10 (1962) (statement of Rep. Mills)
(alteration in original).
   The amended portion of House bill number 6867 concerning
business documents was then added to House bill number 4566,
which also concerned miscellaneous tariff amendments.  See H.
Conf. Rep. No. 97-989, at 40 (1982), reprinted in 1982
U.S.C.C.A.N. 4137, 4140.  House bill number 4566 was passed as
Public Law 97-446 in January, 1983.  Act of Jan. 12, 1983, Pub.
L. No. 97-446, 96 Stat. 2329 (1983).

interpretation of the scope of headings 4906 and 4911, HTSUS.[21]

Therefore, because Murray creates its designs not for its own

internal use, but solely for sale to a customer, the general note

---

[21]The Court notes that classification of some of Murray's designs could possibly be affected by the form in which they are embodied.  Although Labor made no factual findings on the question, the record indicates that Murray provides its designs, according to the customer's wishes, either printed, on CD-ROM, on computer diskette, or via electronic mail.  <u>Remand Determ.</u>, Fed. Reg. at 53,396.  CD-ROMs and diskettes containing recorded information fall under subheading 8524.39.40, HTSUS, covering:

Records, tapes, and other recorded media for sound or other similarly recorded phenomena . . .

> Other:
> > For reproducing representations of instructions, data, sound, and image in a machine readable binary form. . . .

Subheading 8524.39.40, HTSUS.
     Presumably, heading 8524 would also cover other forms of storage devices that can be removed from a computer.  <u>See</u> Headquarters Ruling ("HQ") 965276 (Jan. 23, 2002) (suggesting that software embodied in a non-removable storage device, such as a computer's hard-drive, are not classifiable in heading 8524). The heading does not discriminate between the type of information recorded on the storage device, whether it be picture files, songs, software, or other information; it requires only that some data be recorded onto the media.  Arguably, this would include saved files representing designs such as those provided by Murray to its customers.  In CD-ROM or 3.5-inch diskette form, then, these designs, so long as they are not internal "records" or "diagrams" under general note 19(c), appear to be goods or "articles" within the meaning of the HTSUS, and hence "articles" within the meaning of 19 U.S.C.A. § 2272(a) (West Supp. 2003). Designs which cross the border via electronic mail, however, are exempt under the HTSUS, and are therefore not "articles" within the meaning of 19 U.S.C.A. § 2272(a) (West Supp. 2003).  General note 19(b), HTSUS; <u>see also</u> HQ 114459 (Sept. 17, 1998); HQ 960179 (Apr. 17, 1997).  As Labor has made no determinations regarding how this issue affects Plaintiff's claim, the Court will not consider the issue here.

19(c) exemption does not apply.

Labor's finding that Murray's products are not "articles" within the meaning of the Act is therefore in error. However, the classification of engineering designs, according to the provisions of the HTSUS, may vary according to the form in which they are embodied. The Court therefore remands this matter to the Secretary of Labor for further investigation into the actual nature of the items produced by Murray, for investigation into what proportion of them are printed, or embodied on CD-ROM or diskette, and for investigation as to how this affects Plaintiff's claim for TAA.

Having discussed the effect of the HTSUS on the status of Murray's designs as "articles," the Court moves on to discuss the effect of the NAICS on this question. The NAICS is a system developed jointly by the governments of the United States, Mexico, and Canada for statistical purposes. United States Census Bureau, North American Industry Classification System (NAICS), at http://www.census.gov/epcd/www/naics.html (last visited May 4, 2004). NAICS classifies various industries as either manufacturing or service sector industries. See id. Because "engineering design" is classified in the NAICS as a service, Labor argues that the engineering designs drafted by Murray are not goods or "articles" within the meaning of 19 U.S.C.A. § 2272(a) (West Supp. 2003). See Def.'s Mem. at 9, 11-12; United States Census Bureau, 2002 NAICS Definitions: 541330 Engineering Services, at http://www.census.gov/

epcd/naics02/def/ND541330.HTM#N541330 (last visited May 4, 2004).

However, as Labor has already argued, the word "articles" is used in the Act to refer to items that may be subject to a duty. Whether or not an item is dutiable is not the subject of the NAICS. The NAICS is therefore not relevant to the case at bar. Moreover, even to the extent it might be relevant, Labor's citation of the NAICS begs the question: while the NAICS appears to classify engineering design as a service, it does not speak to the status of the designs resulting from the service.[22]

## CONCLUSION

The Court therefore remands this case to the Secretary of Labor for further investigation into the nature of the designs produced by Murray, and into the manner or form in which these designs are sold as "articles," and into how Plaintiff's claim is affected by Murray's production of designs embodied in various formats: printed, or included on CD-ROM or diskette. The Court reserves the second issue in this case, whether Plaintiff is eligible under 19 U.S.C.A. § 2272(b) (West Supp. 2003) for

---

[22]The Court notes that the record suggests that Murray's customers view themselves as purchasing a product, rather than a service. The record suggests that many of Murray's customers pay by the design, and not by the hour. This could suggest that contracts between Murray and its customers are framed as contracts to purchase a product, rather than to pay for services rendered. See Fax from James Murray, President, Murray Eng'g, Inc., to Del-Min Amy Chen, U.S. Dep't of Labor, Supp. C.R. Doc. No. 2 at 8A (July 28, 2003).

assistance as an adversely affected secondary worker, until such time as Labor has completed its further investigation on the first issue.

Labor shall have until July 2, 2004 to submit its remand determination.  The parties shall have until July 16, 2004 to submit comments on the remand determination.  Rebuttal comments shall be submitted on or before July 23, 2004.


                                        /s/Donald C. Pogue
                                        Donald C. Pogue
                                             Judge

Dated:    May 4, 2004
          New York, New York